### DIAMOND A CATTLE CO. et al. v. TSCHIRGI.

#### No. 13954.

United States Court of Appeals
Eighth Circuit.

May 10, 1950.

M. T. Woods, Sioux Falls, S. D., ( H. L. Fuller, J. B. Shultz, and T. M. Bailey, Jr., Sioux Falls, S. D. on the brief) for appellants.

T. H. Burke, Billings, Mont. (Pat Morrison and Julius Skaug, Mobridge, S. D. on the brief), for appellee.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

The appeal is by the defendants from a judgment in favor of the plaintiff, in a diversity case, tried without a jury, for the balance due under a pasturage contract, and also from an order dismissing the defendants' counterclaims.

The contract involved was in writing, made in 1938, for the pasturage by plaintiff, on his ranch in Montana, of from 2,500 to 5,000 steers, for defendant Diamond A Cattle Company, "during the season of 1938." A grazing fee of 50 cents a month per head was provided for, payable quarterly, "to be computed from the day cattle are unloaded at Wyola (Montana) until the day they are loaded for shipment." Shortly after the signing of the contract, the parties agreed, as evidenced by correspondence between them, that some heifers

and some yearlings also were to be accepted by plaintiff, "upon the same terms," except that the grazing fee for the heifers was to be only 40 cents a month and that for the yearlings 35 cents a month.

The trial court found—and on the evidence the finding cannot be held to be clearly erroneous—that the arrangements for adding heifers and yearlings to the cattle pastured were merely modifications of the original agreement and did not constitute separate and independent contracts, as defendants contended.

The principal question on the appeal is as to the correctness of the trial court's construction of the following provision in the contract: " * * * M. H. Tschirgi (the plaintiff) agrees to pay for all cattle losses (from all causes whatsoever) in excess of 3% per year * * * and is to be paid by Diamond A Cattle Company for all cattle delivered in excess of 97% of the cattle received * * *. It is understood that the price to be paid for cattle over and under the 3% stated above shall be $45.00 per head. Payment for these cattle shall be made when final delivery under this contract has been made."

The grazing fees due plaintiff had all been paid. This suit was to recover the sum of $5,445, under the provision just quoted, for having redelivered to defendants, when the final shipment of cattle was made, 121 head more than the number for which plaintiff claimed to be accountable, after crediting himself with a cumulative loss allowance of 3 per cent per year. The contract had remained in operation from 1938 to 1944. Shipments of cattle were of course made to market from time to time, as defendants directed, and similarly additions were periodically made to those being pastured. Always, however, there was a carry-over from year to year, so that at no time prior to 1944 could it be said that "final delivery under this contract has been made."

It was defendants' contention that the contract did not permit of a cumulative loss-allowance of 3 per cent per year, but that on the contrary it unambiguously provided for only a flat deduction of 3 per cent from the total number of cattle received for pasturing, even though they were left with plaintiff for longer periods than a year. On the basis of such a flat deduction only, there was no overage of cattle in plaintiff's final redelivery, and plaintiff would not have been entitled to any recovery.

The trial court refused to adopt that view of the contract. On the language contained in the provision as a whole, we do not feel that we are entitled to hold that no room existed for construction, nor in the light of the nature of the contract, the situation involved, the varying expressions used in the contract provision, and at least some evidence of seeming recognition before dispute, can we say that the interpretation made by the trial court was improper.

It is true that part of the language of the provision, when read baldly and out of context, says simply that plaintiff is "to be paid * * * for all cattle delivered in excess of 97% of the cattle received." But while this clause, when thus isolatedly read, does not expressly contain the qualification "per year," it is proper to note that plaintiff's reciprocal liability, under the preceding coordinate clause of the sentence, is for "all cattle losses in excess of 3% per year." Though this fact alone could not be said to indicate intended equivalency in the two obligations, the subsequent sentence in the provision fixing the amount per head to be paid by either party does expressly treat the calculation for both as being on the same basis, in speaking of "the price to be paid for cattle over and under the 3% stated above." Since the only place where the figure "3%" expressly appears or —to use the language of the provision—is "stated above" is in the phrase "3% per year," in the first portion of the sentence coordinately dealing with the matter of both overage and underage, the trial court was not without reasonable ground for holding that such was its intended reference and that the implication was inherent that the phrase "per year" therefore had application throughout the sentence.

The seasonal aspect or significance of the dealings involved is further pointed to

in the expression used in the contract with reference to the receipt of the initial cattle, "during the season of 1938." Again, there was some evidence that a summary had been sent defendants in 1943, showing deductions made by plaintiff of 3 per cent per year, to which defendants indicated no objection at the time that the basis or method of calculation was improper. Also, under date of December. 28, 1944, plaintiff sent a similar summary for the whole contract period, with deductions cumulatively computed as before, to which defendants again voiced no disagreement when the tabulation was received or when they thereafter cleaned up the 1944 grazing fees on February 13, 1943. And finally, when plaintiff acknowledged receipt of the grazing check and said, "Incidentally, we should like to know how the shipments for the respective years as shown on the summary which we enclosed with our letter of December 28, 1944, checked with your records for those years," and "We should like very much if you would check this matter up and advise us at your convenience," defendants' general manager replied, under date of March 23, 1945,—still without any claim of misconstruction—"I am glad to be able to tell you that our respective records coincide perfectly except perhaps for a day's difference in the shipping date."

◼ All of this constituted at least some evidence of recognized or accepted construction, to which the trial court could properly give consideration in determining whether the phrase "per year" was intended and understood by the parties to have application to the calculation of overages, the same as it clearly did on plaintiff's liability for underages. And on all the factors involved in the situation, it can hardly here be declared that the trial court was clearly in error in the view it took, that the determination of both overages and underages was intended to be on an annual basis with only payment of the amounts thereof deferred until the contract had been executed. Defendants' first contention must accordingly be ruled against them.

◼ The second contention for reversal is that the court erred in not holding that the claim for overage, or at least a part of it, was barred by So.Dak.Code 1939, § 33.0232, sub. (4) (a), imposing a limitation of 6 years upon contract actions. The argument upon which the contention is premised, however—that there were three separate contracts involved, whose performance had been completed at different times—has been answered by our declaration supra that we cannot say that the court's finding, that the arrangements were merely modifications of the original agreement, was clearly erroneous. And since the contract provision, that payment for overages "shall be made when final delivery under this contract has been made," thus applied to the situation as an entirety, the present action, commenced in 1947, with final delivery under the instrument not having been completed until 1944, was manifestly not, either in whole or in part, barred by the six-year limitation of the South Dakota statute.

The third contention urged is that, even if the trial court was entitled to hold defendant Diamond A Cattle Company thus liable, it still was not warranted in also entering a judgment against defendant Williams personally. Williams was not formally a party to the contract, but during the operation thereof he had purchased all the capital stock of the cattle corporation and he thereafter conducted its business. Later, he had all the corporation's assets transferred to himself as sole stockholder and continued the business as before, under the name Diamond A Cattle Company as his individual trade designation. Plaintiff had made him a defendant in the suit and sought judgment against him on the theory of an assumption of the contract obligation.

◼◼ There was no direct proof of an open agreement to assume, and on the other hand there was nothing in Williams' own testimony or in his other evidence to show that such an assumption had not been made. In any event, the absence of direct proof that an assumption exists does not preclude a finding that such an assumption has been made where the fact is a clear implication from all the circumstances. Cf. Reed Bros.

Co. v. First National Bank, 46 Neb. 168, 64 N.W. 701. One of the most common of these situations is where a corporation's assets have been taken over without consideration (unless an assumption exists) and are used to continue the business for the assignee's own benefit. See 13 Am. Jur., Corporations, §§ 1236, 1237, pp. 1124, 1125. The taking over of the assets for the purpose of continuing the business in such a situation may properly, we think, be found to involve an assumption as a matter of fair import and natural intention between the parties, unless the assignee compellingly demonstrates that the transaction was to the contrary.

Williams, neither by documents of the transaction nor by oral evidence revealed the details of his taking over of the assets and the business of the corporation, except to indicate that as sole stockholder he had the corporation's activity terminated and the assets assigned to himself. And, as previously has been noted, he did not in his testimony undertake to deny that there had been an assumption. Nor did he in his motion for judgment, made after plaintiff rested and renewed at the close of all the evidence, raise any challenge to the sufficiency of the evidence to support a finding of assumption on his part, if such a liability existed against the cattle company on the contract as plaintiff sought to enforce. Beyond this he also was claiming rights on the contract itself by way of asserted counterclaims.

The judgment against Williams obviously rested upon an adoption of plaintiff's theory of assumption, although no specific finding was made to that effect. This no doubt was because, on the evidence and from the grounds urged in defendants' motion for judgment, that question did not purport to be an actual issue.

■■ But even if the situation had been one where a finding of assumption would not have been warranted, there is another ground which equally would disentitle Williams to a reversal now. By South Dakota statute, as in equity generally, the transfer of all the corporation's assets to Williams, without consideration and leaving the corporation insolvent, was fraudulent as to creditors. So.Dak.Code 1939, § 23.0204. Thus an ultimate liability to plaintiff rested upon Williams, since no question seems to have existed as to the sufficiency of the assets taken over to satisfy all of the corporation's obligations. While Williams now attempts to argue that this liability could only be enforced in a court of equity, he raised no such question of jurisdiction in the trial court in relation to the statute. And since the trial court was possessed of general jurisdiction both in equity and at law, we are unable to see how, with no jury involved, it is of substantive importance at this stage whether the court purported to be sitting at law or in equity at the time, where there was no jurisdictional challenge and there properly could be a waiver of a formal delineation between the two jurisdictions in reference to the case. Certainly there is no prejudice demonstrated by the record which would justify us in reversing.

■ The final contention is that it was error to deny defendants' counterclaims. The counterclaims were mainly attempts to recover back alleged overpayments in grazing fees. The trial court held that the tabulations offered to prove the alleged overpayments were incompetent, because the person who had prepared them did not testify nor was there anything else to establish their accuracy or basis. Payments of grazing fees had all been made without dispute on itemized statements which plaintiff periodically submitted. On the record before us, the court was entitled to hold that Williams had not sustained the burden resting on him to establish the alleged grazing-fee overcharges. The court was warranted also in similarly viewing the other counterclaims asserted.

Affirmed.